# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LISA DAHLKE,

        **Plaintiff,**

   v.                                       Case No. 12-CV-00207

MITCHELL BANK,

        **Defendant.**

## DECISION AND ORDER

Plaintiff Lisa Dahlke sues defendant Mitchell Bank, her former employer, for discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). She claims defendant subjected her to a hostile work environment. Defendant filed state law counterclaims alleging that plaintiff conspired to injure it in its trade or business and that she is liable for conversion and fraud because she helped her sister, Laurie Clausen, steal money from it. In response, plaintiff filed an amended complaint, which alleges that defendant's counterclaims are baseless and were filed to retaliate against her for exercising her rights under Title VII. Defendant now moves for summary judgment on both of plaintiff's claims, and plaintiff moves for summary judgment on her retaliation claim and defendant's counterclaims.

## I. BACKGROUND

Defendant is a small, community bank headquartered in Milwaukee. Plaintiff worked for defendant as a part-time teller in its remote branches from September 1997 to July 2009. The remote branches were located in seven senior centers, and, from January 2006 to July 2009, plaintiff was assigned to the Muskego Regency Senior Center and the Tudor

Oaks Senior Center. She worked one to two days per week at each of these locations and also did some work at defendant's main branch office in New Berlin. Sometimes she would begin her work day at the New Berlin branch and then head to one of the remote branches. At other times, she would go to a remote branch first and finish her work day at the main branch. Plaintiff's direct supervisor was Clausen, who was an Assistant Vice-President at the bank. Until September 20, 2007, Clausen's supervisor was Miguel Ocampo. When Ocampo left the bank, Clausen began reporting directly to Jeff Bowman, the Bank's president.

On or about February 2, 2006, Jason Golembiewski became the manager of the New Berlin branch, and plaintiff claims he immediately began harassing her. Plaintiff claims that he twice removed her from the work schedule at the New Berlin office at the last minute. Once he said that she was "not good enough to make my team." Pl.'s Proposed Findings of Fact ("PPFOF") ¶¶ 5, 11, ECF No. 52. And once he called her at home 30 minutes before her shift began and yelled at her, humiliating her in front of co-workers who could hear him yelling. Plaintiff also alleges that in February 2006 Golembiewski saw her assisting her brother, a bank customer, with a transaction and became very angry. He began screaming at her and slamming his fists. He told her she was not allowed to serve her brother and threatened to write her up or fire her if she did. The bank had a policy prohibiting employees from performing transactions for family members but, according to plaintiff, the policy was rarely enforced. Plaintiff believes Golembiewski was abusive toward her because he did not like women.

Plaintiff further alleges that Golembiewski referred to female employees as "bitches" and "old ladies" and called plaintiff "old hag," "prude" and "dummy" and told her to sit at the

2

"dummy window" in the office. Def.'s Proposed Findings of Fact ("DPFOF") ¶ 31, ECF No. 41. She says this name-calling did not occur every time she was in the New Berlin office, but it did occur on a regular basis from February 2006 until she left the bank. *Id.* ¶ 32. Plaintiff alleges in 2006 Golembiewski hired two new tellers and told her, "I want them young and fresh, not old and used like you." *Id.* ¶ 40. She also claims that Golembiewski frequently walked around the lobby saying, "I'm the man, no woman disrespects me," *id.* ¶ 46, and that he intentionally ran the check-sorting machine longer than necessary in front of plaintiff and told her that it sounded like his vibrator. Plaintiff says he was repeating a female employee's comment about the machine. Plaintiff also alleges that in April 2009 Golembiewski told someone on the phone in a loud voice that he was a "pimp" and the female employees in the office were "prostitutes in his stable" who had to do what he said. *Id.* ¶ 45.

Plaintiff states that Golembiewski treated other female employees similarly. She states that she heard him refer to Clausen as "the nun," and repeatedly ask her, "How did you ever have two kids? You are always so buttoned up," and say that, "For a woman your age, you look pretty good." *Id.* ¶ 33, 35. And she claims Colleen Block, a female teller, told her that she had a recording of Golembiewski saying that Block would be happier if she "got a little piece of ass." *Id.* ¶ 38. Plaintiff includes in her submission a copy of a discrimination charge that Block filed with the Equal Employment Opportunity Commission ("EEOC") in March 2010 that mentions the recording. Plaintiff also says that she heard Golembiewski regularly comment on the appearance of female customers noting if they were "hot" and questioning, "Why is she so fat?" *Id.* ¶ 34. Plaintiff states that

Golembiewski sometimes pretended to look at a file while checking out women in the drive-up lane. She says he would call over Brad Birchbauer, a Vice President/Commercial Lender, or Tom Hart, a Vice President, so they could discuss the women, saying things like "they look hot" or asking, "Why are they dressed so skimpy?" *Id.* ¶ 42–43.

From 1997 through 2009, defendant had in place a written policy regarding harassment which was set out in plaintiff's employee handbook. The policy prohibited harassment on the basis of sex and directed employees who were the victims of such harassment to "immediately file a complaint using the Complaint Procedure or go directly to Human Resources or the President." DPFOF ¶ 78. The Complaint Procedure stated that an employee should make a complaint to the following people: "1. Your immediate supervisor; 2. Your supervisor's supervisor; 3. Human Resources; [and] 4. The President." *Id.* It stated that, "Although your immediate supervisor should be able to help you with the vast majority of your complaints, employees should feel encouraged to go directly to Human Resources or the President if they feel that their immediate supervisor is not addressing their complaint to their satisfaction [or] their supervisor may be part of their complaint." *Id.* Plaintiff states that she followed this policy and complained about the harassment of women in the New Berlin office on several occasions. She also claims Clausen and Block complained about the harassment. I will discuss these complaints in detail later in this opinion.

On July 2, 2009, Clausen was terminated because she violated bank policy by borrowing over $50,000 from one of the bank's senior center customers. On the same day, plaintiff stopped coming to work. Plaintiff states that she stopped coming to work because she objected to the bank's firing of her sister. Plaintiff also states that she thought that she

4

would have to start reporting to Golembiewski, and that she would not have felt safe working for him.

In August 2009, Clausen confessed to the FBI that between February 2007 and June 2009 she had stolen approximately $40,000 to $50,000 from the safes at defendant's senior center branches. Defendant's subsequent audit determined that $60,515.12 was missing. Clausen later pled guilty in federal court to stealing this money. *See U.S.A. v. Clausen*, Case No. 10-CR-00037 (E.D. Wis.) (plea agreement). Defendant asserts that plaintiff was complicit in her sister's theft because more than $20,000 of the money Clausen admitted stealing came from the Muskego Regency and Tudor Oaks branches. Besides Clausen, plaintiff was the only other employee who worked at these locations. At the end of each of her shifts from February 2007 until June 2009, plaintiff would count and record the amount of cash present at each senior center branch in a notebook kept at the branch. She would also complete a "cash memo." On the cash memo, plaintiff would list the amount of money in the cash box at the branch and itemize the number of bills of each denomination. She would then list the amount of additional cash in the safe as "miscellaneous cash." Prior to July 2008, plaintiff and Clausen took turns taking the cash memo back to the New Berlin branch and keying it into the main system to generate a "teller tape." The person entering the data would then sign the teller tape, representing to the bank that the teller tape showed the amount of cash physically present at the remote branch. Defendant asserts that Clausen and plaintiff could have used the miscellaneous amount listed on each cash memo and teller tape as a "plug amount" to hide the fact that some of the cash was missing.

After July 2008, Clausen signed all of the teller tapes for the Tudor Oaks location,

5

Case 2:12-cv-00207-LA    Filed 02/27/14    Page 5 of 17    Document 69

and, after October 2008, she signed all of the teller tapes for the Muskego Regency location. Plaintiff argues that during this period her sister could have been inflating the amount of miscellaneous cash listed on plaintiff's cash memo when she entered the data for the teller tape. This would have allowed her to hide her theft from plaintiff and the bank. Plaintiff had the opportunity to go through 13 bankers boxes of cash memos and teller tapes from the Tudor Oaks and Muskego Regency senior centers during discovery, but she has not produced any teller tapes that do not match the day's cash memo.

      Plaintiff also completed "cash purchase transactions" for the senior center branches in which she would transfer cash from the vault at the New Berlin branch to a remote branch. Generally, a cash purchase transaction is done when there is not enough cash on hand at a location to process daily transactions. For example, a branch may be low on a particular denomination of bill or a customer may have requested an unusually large amount of cash. For the most part, the customers at the senior center branches did not do large cash transactions so the remote branches did not need to have a lot of cash on hand. Nonetheless, on January 15, 2008, plaintiff transferred $1,510.00 of cash from the New Berlin vault to the Muskego branch, while simultaneously reporting that the branch had $7,580.91 in available cash. On March 4, 2008, she transferred $1,550.00 to the Muskego branch, while reporting that the branch had $7,624.23 in available cash. And, on March 7, 2008, plaintiff transferred $750.00 to the Muskego branch, while reporting that the branch had $8,174.30 in available cash. Additionally, on May 13, 2008, she transferred $2,000.00 to the Tudor Oaks branch, while reporting that it had $6,801.29 in available cash. And, on August 12, 2008, she transferred $1,500.00 to the same branch, while reporting that it had $6,812.92 on hand. Plaintiff says there must have been a legitimate reason for each of

6

these cash purchase transactions, but at this point she cannot recall what it was.

When defendant audited the Muskego Regency and Tudor Oaks safes in August 2009, it found that $20,313.49 was missing. The Muskego Regency safe was supposed to have $9,923.93 in it, but it had only $40.35. The Tudor Oaks safe was supposed to have $10,435.78 in it, but it had only $5.87. No one had opened the safes since Clausen was terminated on July 2, 2009.

## II. DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. *Ferraro v. Hewlett Packard Co.*, 721 F.3d 842, 847 (7th Cir. 2013).

**A. Plaintiff's Hostile Work Environment Claim**

To survive summary judgment on her hostile work environment claim, plaintiff must demonstrate: 1) her work environment was both objectively and subjectively offensive, 2) the harassment was directed at her because of her sex, 3) the conduct was so severe or pervasive that it altered the conditions of her employment, and 4) there is a basis for employer liability. *Mendenhall v. Mueller Streamline* Co., 419 F.3d 686, 691 (7th Cir. 2005).

Here, plaintiff has presented evidence that would allow a reasonable jury to conclude that she was subjected to harassment on account of her sex that was both objectively and subjectively offensive. She says Golembiewski referred to the female

7

employees in the New Berlin office, including herself, as "bitches" or "old ladies," and that he called her "old hag" and "prude" and told her she was "old and used." She also says he made comments about Clausen in front of plaintiff, calling her "the nun" because she was so buttoned up and speculating about the nature of her sex life. He also regularly objectified female customers in front of plaintiff and encouraged other male managers to do the same. He would comment on whether a female customer was hot or fat and note if she was wearing skimpy clothes. He would also intentionally run the check-sorting machine in front of plaintiff and say it sounded like a vibrator because he knew it bothered her. Additionally, Golembiewski allegedly walked around the office saying, "I'm the man, no woman disrespects me," and at least once said he was a "pimp" and that the women in the office, including plaintiff, were all "prostitutes" who had to do what he said. All of this conduct was directed at plaintiff and the women around her because of their gender. It was also objectively offensive, and plaintiff testified that she found it subjectively offensive.

The next question is whether the conduct was so severe or pervasive that it altered the conditions of plaintiff's work environment. The factors a court can consider when determining whether a work environment was hostile are: "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quoting *Mendenhall*, 419 F.3d at 691). Derogatory comments about women made in plaintiff's presence that were not directed at her personally are characterized as "second-hand" harassment, which is considered less severe but is still relevant to a hostile work environment claim. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005). Here, plaintiff

8

says that Golembiewski harassed her, Clausen and Block on a regular basis for over three years in several different ways. He called them names that were derogatory to women ("bitches," "old ladies," "old hag," "prude" and "prostitutes"), and he applied all of these names directly to plaintiff. He also made it clear that he was judging women, both employees and customers, on their looks, and that he felt comfortable commenting on their sex lives. And he repeatedly announced that the women in the office should not disrespect him because he was a man. This conduct was not physically threatening, but it was humiliating and it occurred on a sufficiently regularly basis that a reasonable jury could find it altered the conditions of plaintiff's work environment.

Defendant argues that the conduct could not possibly have risen to the level of a hostile work environment because it only occurred at one of plaintiff's work sites. Defendant points out that she spent most of her time by herself at the remote bank branches. Title VII does not, however, require that a person be subjected to harassment every day that she is at work in order to support a hostile work environment claim. The person only needs to prove that the harassment was severe or pervasive enough to alter the conditions of the person's work environment. Proof that a person was consistently sexually harassed at one of the three work sites that she had to regularly report to is sufficient to meet this requirement.

The last element is employer liability. Employer liability under Title VII depends on whether the harassing employee was the plaintiff's supervisor or merely a co-worker. An employee is considered a "supervisor" "if he or she is empowered by the employer to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

Case 2:12-cv-00207-LA   Filed 02/27/14   Page 9 of 17   Document 69

different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Plaintiff alleges that she was harassed by Golembiewski, Birchbauer and Hart. She concedes that Birchbauer and Hart were not her supervisors but argues that Golembiewski was her supervisor because he threatened to write her up or terminate her. Plaintiff, however, presents no evidence indicating that Golembiewski actually did either of these things or that he had the power to do them. Therefore, I conclude that Golembiewski was not her supervisor.

When a co-worker harasses an employee, the employer is liable only if the employee can prove that the employer was negligent in discovering or remedying the harassment. *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866 (7th Cir. 2013). An employer will be held liable for harassment if it knew or should have known about the harassment and failed to take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 569 (7th Cir. 2012). "If the employer has established a set of procedures for reporting complaints about harassment, the complainant ordinarily should follow that policy in order to provide notice sufficient for the employer to be held responsible, unless the policy itself is subject to attack as inadequate." *Lambert*, 723 F.3d at 866–67. An employer will, however, be charged with constructive notice of harassment if the harassment is obvious, even if no one complained about it. *Mason v. So. Ill. Univ.*, 233 F.3d 1036, 1046 n.8 (7th Cir. 2000).

Plaintiff claims defendant is liable for the conduct of Golembiewski and the other male managers in the New Berlin office because defendant had actual or constructive

10

notice that these men were sexually harassing plaintiff and the other female employees in office, and defendant did nothing to stop the harassment. She claims defendant either knew about or should have known about the sexual harassment because she, Clausen and Block all complained about it. Plaintiff says she, Clausen and Block were the only three female employees who worked in the New Berlin branch.[3]

First, plaintiff states that in February 2006 she told Ocampo that Golembiewski had taken her off the schedule at the last minute and yelled at plaintiff when she attempted to help her brother with a transaction. She also told Ocampo that Golembiewski would often make rude comments and specifically mentioned that he called older female employees "old hags." Plaintiff did not expressly tell Ocampo that she believed she was being sexually harassed, but she argues that this should have been obvious from her complaints about the name-calling. In response, Ocampo held a meeting with plaintiff and Golembiewski. He instructed Golembiewski that he needed to treat plaintiff with respect, and Golembiewski apologized to her. But, shortly after the meeting, plaintiff says Golembiewski again yelled at her and removed her from the schedule at the last minute. She says she complained about this to Ocampo, and he told her, "I tried to take care of it, but I was told I could merely suggest to him how to treat you. I can't tell him how to treat you." PFOF ¶ 12. Ocampo did nothing else to follow up on plaintiff's complaint.

Second, in April 2009, plaintiff states that she called Bowman and informed him that Golembiewski had referred to herself, Clausen and Block as "prostitutes" and said they

---

[3] Plaintiff says the branch occupied the first floor of defendant's New Berlin office. So, there were other women working in the building but they did not work in the bank branch itself.

"had to do whatever he said as the pimp." PPFOF ¶ 24. Bowman told plaintiff that he thought Golembiewski was looking for another job and said he would look into the situation, but he did nothing to address the problem.

Finally, plaintiff presents evidence that shows Clausen and Block also complained about harassment. As proof that Clausen and Block complained, plaintiff provides copies of charges of discrimination that they filed with the EEOC in 2010.[4] Clausen's complaint states that the sexual harassment she experienced included

> "descriptions of me as an old hag, prostitute and dummy; co-workers calling attention to women customers because they were 'hot'; co-workers staring at women's breasts; co-workers answering the phone as 'Frank's house of lovin' and rubin' [sic]. Which body part do you want me to rub' or in other similar ways; statements that women co-workers should 'get laid' more often; and male co-workers apparently rubbing themselves in their pants pockets."

Salawdeh Decl. Ex. 2, ECF No. 53-2. She states that she "regularly made complaints regarding this conduct," and that Bowman responded by saying, "What do you expect me to do?" *Id.* In her EEOC complaint, Block claims she was also sexually harassed and provides examples of the harassment. She says managers made derogatory comments about her gender and age, that managers "would refer to women as 'bitches' or 'old ladies,'" that "[s]exual comments and jokes were made that were inappropriate for the office setting," that "[e]mails containing nudity and other sexual content were sent in the workplace," and that "[c]omments about females' appearance and what we wore were frequently made." *Id.* Ex. 3. She also says that Golembiewski told Birchbauer in February

---

[4] The EEOC complaints are signed by Clausen and Block, who averred that the information contained therein was accurate, and both complaints indicate that they were made on the basis of personal knowledge. Therefore, I treat them as affidavits admissible for the purposes of summary judgment under Fed. R. Civ. P. 56(c)(4). Both Clausen and Block have voluntarily dropped their claims against defendant.

2009 that Block would be happier if she "got a piece of ass." *Id.* She says she complained to Bowman "several times" about this harassment, but he did nothing about it. As a result, she says she was forced to quit.

Based on these allegations, a reasonable jury could conclude that defendant either knew or should have known that plaintiff was being sexually harassed at the New Berlin branch. On their own, plaintiff's complaints were probably not sufficient to put on defendant on notice that Golembiewski and other male managers were consistently engaging in sexual harassment. But her complaints have more weight when considered in combination with Clausen and Block's complaints. The fact that defendant received multiple sexual harassment complaints of a similar nature from all three of the women working in the New Berlin branch should have made it obvious to defendant that there was a problem at the branch. At the very least, the complaints should have prompted defendant to investigate further. But defendant did nothing. Since defendant did not investigate or otherwise address the problem, a reasonable jury could find that it was negligent in discovering or remedying the sexual harassment that plaintiff says she suffered.

For all of these reasons, I will deny defendant's motion for summary judgment on plaintiff's hostile work environment claim.

**B. Plaintiff's Retaliation Claim**

In its counterclaims, defendant accuses plaintiff of helping Clausen steal money from the bank and claims that she is liable for engaging in a conspiracy to injure another's business in violation of Wis. Stat. § 134.01 and for conversion and fraud. Plaintiff asserts that these counterclaims are retaliatory. She attempts to prove retaliation through the direct method of proof. Under this method, she must show: 1) she engaged in a statutorily

13

protected activity, 2) her employer or former employer subjected her to an adverse action, and 3) there was a causal link between the protected activity and the adverse action. *Brown v. Advocate So. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012). Actions taken in the course of litigation can constitute an adverse action that provides the basis for a retaliation claim under Title VII, but such cases are "rare." *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998). Plaintiff argues that defendant's counterclaims must be retaliatory because they are baseless. In response, defendant argues that its claims are not baseless and that it has a First Amendment right to bring them. "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances," and a party has a right to bring a legal claim as long as there is a "reasonable basis" for it. *Bill Johnson's Restaurants, Inc. v. National Labor Relations Board*, 461 U.S. 731, 741–43 (1983). A claim lacks a "reasonable basis" if it "lacks a reasonable basis in fact or law." *Id.* at 748.

    Defendant has presented evidence which shows that Clausen admitted to stealing more than $20,000 from the Muskego Regency and Tudor Oaks senior center branches between February 2007 and June 2009, and that plaintiff, who had a close relationship with Clausen, was the only other employee working at those branches during that time period. Not only that, but plaintiff admits she counted the money in each safe at the end of each of her shifts and recorded the value of the cash on a cash memo. On this memo, she listed the cash kept in the safe as "miscellaneous cash" and did not itemize the number of bills of each denomination—a practice would have made it easier for her to hide the fact that some of the cash in the safe was missing. Plaintiff also completed cash purchase transactions for the remote branches at times when there appeared to be plenty of

14

available cash. And she stopped coming to work on the day Clausen was fired without providing an explanation. The next time defendant opened the safes they contained only $40.35 and $5.87, even though each one was supposed to contain over $9,000.00. While defendant may not ultimately be able to prove plaintiff was complicit in Clausen's theft, this circumstantial evidence raises a genuine question of fact about plaintiff's involvement.

Plaintiff argues that the evidence is inconclusive because she did not sign any teller tapes for the remote branches after October 2008. After that date, she argues Clausen could have inflated the amount of cash listed on the cash memos whenever she entered the data to generate a teller tape. This would have allowed her to hide the fact that she had stolen money from plaintiff. This is an interesting theory, but plaintiff does not offer any evidence to support it. Plaintiff also points out that defendant offered to reinstate her in June 2010, after she filed her charge of discrimination with the EEOC. She argues that defendant would not have done this if it had any reason to suspect that she was involved with the theft. I agree that reinstating a bank teller that the bank suspects of stealing money would be a questionable business decision. But defendant's offer of reinstatement alone is not sufficient to prove that plaintiff is innocent. It does not change the nature of the evidence before this court.

Because defendant's claims are not baseless, I conclude that they do not violate Title VII and that defendant has a right to bring them. While it is somewhat suspicious that defendant waited until plaintiff filed her employment discrimination claim to accuse her of theft, the timing of the counterclaims can be explained by the fact that they are compulsory counterclaims under Fed. R. Civ. P. 13(a). In her complaint, plaintiff alleges that she quit her job "because she did not feel safe working for Mr. Golembiewski." Compl. ¶ 31, ECF

15

No. 1. In response, defendant claims she quit her job because she was complicit in her sister's theft and knew it would soon be discovered. Based on these facts, I conclude that defendant's counterclaims arise out of the same "transaction or occurrence" as plaintiff's hostile work environment claim. *See* Fed. R. Civ. P. 13(a)(1)(A).

**C. Defendant's Counterclaims**

Plaintiff's motion for summary judgment says that she seeks summary judgment on all of defendant's counterclaims, but she does not specifically address the merits of these claims. Instead, she argues generally that they are frivolous and that there is no evidence to support them. Since I have found that the counterclaims are not frivolous, I will deny plaintiff's motion for summary judgment on them.

I will also grant defendant's motion to strike the references made in plaintiff's reply brief in support of her motion for summary judgment to statements James Maloney allegedly made to the Wisconsin State Labor and Industry Review Commission. Plaintiff did not file a brief in opposition to this motion. Civil L.R. 7(d) (E.D. Wis.) ("Failure to file a memorandum in opposition to a motion is sufficient cause for the Court to grant the motion.").

**THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment (Docket #40) is **DENIED in part** and **GRANTED in part**.

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment (Docket #50) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion to strike (Docket #67) is **GRANTED**.

16

Case 2:12-cv-00207-LA   Filed 02/27/14   Page 16 of 17   Document 69

Dated at Milwaukee, Wisconsin, this 27th day of February, 2014.

                                                  s/ Lynn Adelman
                                                  _____
                                                  LYNN ADELMAN
                                                  District Judge

17

Case 2:12-cv-00207-LA   Filed 02/27/14   Page 17 of 17   Document 69